## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1]<br><br>        Remaining Debtors. | Chapter 11<br><br>Case No. 17-12560 (JKS) |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the WOODBRIDGE LIQUIDATION TRUST,<br><br>        Plaintiff,<br><br>v.<br><br>ANDREW R. VARA, in his capacity as the United States Trustee for Region 3; TARA TWOMEY, in her capacity as Director of the Executive Office for United States Trustees; and THE UNITED STATES TRUSTEE PROGRAM,<br><br>        Defendants. | Adversary No. 22-50516 (JKS) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
## RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

*(cover continued on next page)*

---

[1] On February 25, 2019, the Court entered an order closing the Bankruptcy Cases of all Debtors except Woodbridge Group of Companies, LLC and Woodbridge Mortgage Investment Fund 1, LLC (together, the "Remaining Debtors"). The Remaining Debtors' Bankruptcy Cases are being jointly administered under Case No. 17-12560 (KJC). The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard, #302, Sherman Oaks, California 91423.

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
WENDY COX
Trial Attorney
Department of Justice
Executive Office for
United States Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax: (202) 307-2397

ANDREW R. VARA,
United States Trustee, Region 3
JOSEPH J. MCMAHON, JR.
Assistant United States Trustee
TIMOTHY J. FOX, JR.
Trial Attorney
KATE M. BRADLEY
Trial Attorney
Department of Justice
Office of the United States Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
(302) 573-6491
Fax: (302) 573-6497
Timothy.Fox@usdoj.gov

September 15, 2023

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

1.  Bankruptcy Cases are Administered by the Executive Branch under the Trustee Program in 88 Districts; in 6 Districts, Bankruptcy Cases are Administered by the Judicial Branch under the Administrator Program. ................................................................. 3

2.  Congress Established Chapter 11 Quarterly Fees to Avoid Burdening Taxpayers with the Costs of Administering Bankruptcy Cases. ........................................................ 5

3.  When Congress Added Subsection (a)(7) to 28 U.S.C § 1930, It Intended that Chapter 11 Debtors in Administrator Program Districts Would Pay Quarterly Fees Equal to Those Paid by Debtors in Trustee Program Districts. ....................................................... 6

4.  The Judicial Conference's Standing Order Required Administrator Program Districts to Charge Quarterly Fees Equal to Those Charged in Trustee Program Districts; Administrator Program Districts Matched Those Fees and Fees Increases for Seventeen Years. ................................................................................................ 7

5.  In 2017, Congress Increased Quarterly Fees in Trustee Program Districts to Avoid Burdening Taxpayers with Any Funding Shortfall; Administrator Program Districts Failed to Match the Fee Increases Despite the 2001 JCUS Order Remaining in Effect and Binding Upon Judicial Branch Employees Under 28 U.S.C. § 331. ............................ 8

6.  In 2021, Congress Amended 28 U.S.C. § 1930(a)(7) to Ensure Uniformity. .................... 9

7.  In *Siegel*, the Supreme Court Held That Exempting Debtors in Two States from the 2017 Fee Increase Violated the Uniformity Requirement But Remanded the Question of Remedy. ................................................................................................ 10

8.  Prior to *Siegel* Decision, Debtors and Plaintiff Paid Quarterly Fees Without Dispute. ..... 11

9.  Plaintiff Seeks Repayment of Quarterly Fees After *Siegel*. ..................................... 12

10. Status of Post-*Siegel* Decisions on Remand. ...................................................... 13

11. Writ of Certiorari. .................................................................................... 15

ARGUMENT ................................................................................................ 15

I.    LEGAL STANDARDS ................................................................................ 15

II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE A MONETARY AWARD IS NOT THE APPROPRIATE REMEDY FOR THE BANKRUPTCY CLAUSE VIOLATION IDENTIFIED IN *SIEGEL*. ............................. 16

      A.   The Constitutional Violation Is Fully Remedied Through Prospective Action.... 16

      B.   Plaintiff's Dissatisfaction with the Remedy Provided by Congress Is Not Grounds to Contravene Congress's Preferred Remedy. ..................................... 19

III.  TO THE EXTENT A RETROSPECTIVE REMEDY IS REQUIRED, THE REMEDY IS EXTENSION OF THE MAIN RULE—THE 2017 ACT'S FEE INCREASE. ............... 22

      A.   The Appropriate Retrospective Remedy Must Reflect Congressional Intent....... 22

B.    At a Minimum, a Retrospective Remedy Does Not Apply to the Quarters When the Bankruptcy Administrators Violated the Still-Mandatory 2001 Judicial Conference Standing Order By Not Collecting Equal Fees.................................. 29

IV.    THIS COURT SHOULD NOT FOLLOW THE ERRONEOUS DECISIONS OF THE SECOND, NINTH, TENTH, AND ELEVENTH CIRCUITS. ....................................... 30

V.    EVEN IF THIS COURT WERE TO CONCLUDE REPAYMENT IS THE APPROPRIATE REMEDY, THE UNITED STATES CANNOT LAWFULLY REPAY UNTIL THE ATTORNEY GENERAL CERTIFIES THAT NO APPEAL WILL BE TAKEN FROM THE JUDGMENT OR NO FURTHER REVIEW WILL BE SOUGHT. ...................................................................................................................................... 33

CONCLUSION.................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Indus. of Mo. v. Lohman*,
  511 U.S. 641 (1994)...................................................................................21

*Ayotte v. Planned Parenthood of N. New Eng.*,
  546 U.S. 320 (2006).............................................................................19, 26

*Barr v. American Association of Political Consultants* (*AAPC*),
  140 S. Ct. 2335 (2020)..............................................................18, 19, 20, 27

*Beneficial Consumer Disc. Co. v. Poltonowicz*,
  47 F.3d 91 (3d Cir. 1995)..........................................................................28

*In re Buffets, LLC*,
  597 B.R. 588 (Bankr. W.D. Tex. 2019), *rev'd and remanded*, 979 F.3d 366
  (5th Cir. 2020).............................................................................................9

*Califano v. Westcott*,
  443 U.S. 76 (1979)....................................................................................24

*Cedar Chem. Corp. v. United States*,
  18 Cl. Ct. 25 (1989) .................................................................................33

*In re Clinton Nurseries, Inc.*,
  53 F.4th 15 (2d Cir. 2022) ...................................................................13, 15

*Comptroller of Treasury of Md. v. Wynne*,
  575 U.S. 542 (2015)...................................................................................23

*Conboy v. SBA*,
  992 F.3d 153 (3d Cir. 2021).......................................................................28

*Cranberry Growers Coop. v. Layng*,
  930 F.3d 844 (7th Cir. 2019) .....................................................................21

*Dixon v. United States*,
  900 F.3d 1257 (11th Cir. 2018) .................................................................33

*Egbert v. Boule*,
  142 S. Ct. 1793 (2022)..........................................................................19, 21

*FDIC v. Meyer*,
  510 U.S. 471 (1994)...................................................................................28

*Fitzgerald v. Siegel (In re Cir. City Stores, Inc.)*,
  No. 23-135 (4th Cir. June 27, 2023) .....................................................................14

*Franklin v. Navient, Inc.*,
  534 F. Supp. 3d 341 (D. Del. 2021), *as amended* No. 1:17-cv-1640, 2021 WL
  2915033 (D. Del. July 12, 2021).........................................................................19

*Fulton Corp. v. Faulkner*,
  516 U.S. 325 (1996)...........................................................................................31

*Harper v. Virginia Dep't of Taxation*,
  509 U.S. 86 (1993).......................................................................................21, 31

*Heckler v. Mathews*,
  465 U.S. 728 (1984).............................................................................16, 17, 20

*Iowa-Des Moines Nat'l Bank v. Bennett*,
  284 U.S. 239 (1931)...........................................................................................31

*In re John Q. Hammons Fall 2006, LLC*,
  No. 20-3203, 2022 WL 3354682 (10th Cir. Aug. 15, 2022), *reinstating* 15
  F.4th 1011 (10th Cir. 2021) ..........................................................................13, 15

*Lane v. Pena*,
  518 U.S. 187 (1996)...........................................................................................28

*Levin v. Commerce Energy, Inc.*,
  560 U.S. 413 (2010)...........................................................................................23

*Lindenbaum v. Realgy, LLC*,
  13 F.4th 524 (6th Cir. 2021) .........................................................................19, 25

*McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*,
  496 U.S. 18 (1990).........................................................................21, 22, 26, 31

*Newsweek, Inc. v. Florida Department of Revenue*,
  522 U.S. 442 (1998).......................................................................................31, 32

*Office of the United States Trustee v. John Q. Hammons Fall 2006, LLC*,
  No. 22-1238 (U.S.).............................................................................................26

*Orr v. Orr*,
  440 U.S. 268 (1979)...........................................................................................20

*Peony Park v. O'Malley*,
  121 F. Supp. 690 (D. Neb. 1954), *aff'd*, 223 F.2d 668 (8th Cir. 1955) ...................27

*Pitta v. Andrew R. Vara (In re VG Liquidation)*,
　No. 22-50416 (JTD), 2023 WL 3560414 (Bankr. D. Del. May 18, 2023) ...........................32

*In re Prines*,
　867 F.2d 478 (8th Cir. 1989) ................................................................................17

*Railway Labor Executives' Assn. v. Gibbons*,
　455 U.S. 457 (1982) ............................................................................................22

*Reich v. Collins*,
　513 U.S. 106 (1994) .......................................................................................31, 32

*Rosenberg v. United States*,
　72 Fed. Cl. 387 (Fed. Cl. 2006) ..........................................................................27

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
　No. S-06-2845 LKK/JFM, 2012 WL 5387194 (E.D. Cal. Nov. 1, 2012) ..............................33

*Sessions v. Morales-Santana*,
　582 U.S. 47 (2017) ................................................................................... *passim*

*Siegel v. Fitzgerald*,
　142 S. Ct. 1770 (2022) ............................................................................. *passim*

*Siegel v. Fitzgerald (In re Circuit City Stores, Inc.)*,
　Adv. No. 19-20391-KRH, 2022 WL 17722849 (Bankr. E.D. Va. Dec. 15,
　2022) ................................................................................................14, 28, 32

*St. Angelo v. Victoria Farms, Inc.*,
　38 F.3d 1525 (9th Cir. 1994), *amended*, 46 F.3d 969 (9th Cir. 1995) ...................6, 7, 17, 19

*U.S. Dep't of the Treasury v. Galioto*,
　477 U.S. 556 (1986) ............................................................................................20

*United States Trustee Region 21 v. Bast Amron LLP (In re Mosaic Management
　Group, Inc.)*,
　71 F.4th 1341 (11th Cir. 2023) ...........................................................14, 30, 31, 32

*United States v. 30,006.25 in U.S. Currency*,
　236 F.3d 610 (10th Cir. 2000) .............................................................................28

*United States v. Mitchell*,
　445 U.S. 535 (1980) ............................................................................................28

*United States v. Nordic Village, Inc.*,
　503 U.S. 30 (1992) ..............................................................................................21

*USA Sales, Inc. v. Office of the United States Trustee,*
   76 F.4th 1248 (9th Cir. Aug. 10, 2023) ...............................................14, 32

*Zehner v. Trigg,*
   133 F.3d 459 (7th Cir. 1997) ............................................................20

*Ziehl v. Vara (In re TWC Liquidation Trust, LLC),*
   No. 18-10601 (MFW) (Bankr. D. Del. Sept. 14, 2023)...................32, 34

**Statutes**

11 U.S.C. § 549.............................................................................................28

11 U.S.C. § 549(d) ...............................................................................27, 28

11 U.S.C. § 1112(b)......................................................................................22

28 U.S.C. § 331.......................................................................................8, 29

28 U.S.C. § 589a(b)(5) ...................................................................................6

28 U.S.C. § 589a(f) .......................................................................................10

28 U.S.C § 1930......................................................................................6, 7, 29

28 U.S.C. § 1930(a)(6) .......................................................................... *passim*

28 U.S.C. § 1930(a)(6)(A) ..............................................................................6

28 U.S.C. § 1930(a)(7)....................................................................................9

28 U.S.C. § 2414...........................................................................................33

Bankruptcy Administration Improvement Act of 2020, Pub. L. No. 116-325, 134
   Stat. 5086 (2021):
      § 2(a)(4)(B), 134 Stat. 5086 ....................................................9, 10, 17
      § 3(b), 134 Stat. 5087.........................................................................10
      § 3(d)(2), 134 Stat. 5088 .........................................................9, 16, 24

Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of
   1986, Pub. L. No. 99-554, 100 Stat. 3088:
      § 302(d)(3), 100 Stat. 3121 ...............................................................4, 5

Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, Div. B, 131 Stat. 1229:
      § 1002, 131 Stat. 1229 ..........................................................................8
      § 1003, 131 Stat. 1231 ..........................................................................8
      § 1004, 131 Stat. 1232 ..........................................................................8
      § 1004(b), 131 Stat. 1232......................................................................8

§ 1004(c), 131 Stat. 1232 ...........................................................................8

Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978)................................4

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459,
    (2022):
      § 4, 136 Stat. 4462 .......................................................................29
      Div. B, Tit. II, 136 Stat. 4524 (United States Trustee System Fund) ....................................28

Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, 114 Stat. 2410:
      § 105, 114 Stat. 2412 ....................................................................7
      § 501, 114 Stat. 2421-2422 .............................................................5

Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-
    650, Tit. III, § 317, 104 Stat. 5115.................................................................5

**Other Authorities**

168 Cong. Rec. S7819 (daily ed. Dec. 20, 2022) (Explanatory Statement
    Submitted by Mr. Leahy, Chair of the Senate Comm. on Appropriations,
    Regarding H.R. 2617, Consolidated Appropriations Act, 2023)............................................29

Fed. R. Bankr. P. 7056...........................................................................1, 15

Fed. R. Bankr. P. 7062.............................................................................33

Fed. R. Civ. P. 56................................................................................1, 15

Fed. R. Civ. P. 56(a).............................................................................16

Fed. R. Civ. P. 62.................................................................................33

H.R. Rep. No. 99-764 (1986)...................................................................5, 23

H.R. Rep. No. 115-130 (2017)...................................................................8

Judicial Conference of the United States, *Report of the Proceedings of the
    Judicial Conference of the United States*:
      (Mar. 13, 1990), https://go.usa.gov/xFVfK .............................................5
      (Sept./Oct. 2001), https://www.uscourts.gov/sites/default/files/2001-09_0.pdf............7, 8, 29
      (Sept. 13, 2018), https://www.uscourts.gov/sites/default/files/2018-
      09_proceedings.pdf............................................................................9

*Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal
    Courts Improvement Act of 1999: Hearing Before the Subcomm. on Courts
    and Intellectual Property of the House Comm. on the Judiciary on H.R. 2112
    and H.R. 1752*, 106th Cong., 1st Sess. 26 (1999) ....................................................7

U.S. Bankruptcy Administrator for the Northern District of Alabama, *Instructions Concerning Chapter 11 Quarterly Fees* § V, https://perma.cc/WZK3-N3M6......................26

U.S. Bankruptcy Courts-Business and Nonbusiness Cases Commenced, by Chapter of the Bankruptcy Code, During The 12-Month Period Ending December 31, 2018, Tbl. F-2, https://www.uscourts.gov/sites/default/files/data_tables/bf_f2_1231.2018.pdf.....................25

U.S. Const. amend. V...............................................................................................21, 22

U.S. Const. art. I, § 8, cl. 1............................................................................................27

U.S. Const. art. 1, § 8, cl. 4 ................................................................................. *passim*

Defendants, Andrew R. Vara, United States Trustee for Region Three ("United States Trustee"), Tara Twomey, Director Executive Office for United States Trustees, and the "United States Trustee Program," (collectively "Defendants"), submit this memorandum of law in support of their *Motion for Summary Judgment* (filed concurrently), under Federal Rule of Civil Procedure 56, made applicable herein by Federal Rule of Bankruptcy Procedure 7056.  In addition, Defendants respond to *Plaintiff's Motion for Summary Judgment* (Dkt. 12) filed by Plaintiff, Michael Goldberg, solely in his capacity as liquidating trustee (the "Liquidation Trustee") of the Woodbridge Liquidation Trust (the "Liquidation Trust"), ("Plaintiff").[2]

## SUMMARY OF ARGUMENT

1.     The premise of Plaintiff's adversary proceeding is that quarterly fees he and his predecessors paid pursuant to an increase established by the 2017 amendment to 28 U.S.C. § 1930(a)(6) should be repaid to the extent of the increase.[3]  In *Siegel v. Fitzgerald*, the Supreme Court held that the statute was unconstitutionally non-uniform, but declined to decide what, if any, further remedy was warranted for that constitutional defect.  *See Siegel*, 142 S. Ct. 1770, 1783 (2022) (noting a "host of legal and administrative concerns with each of the remedies proposed").

---

[2] In his motion, Plaintiff "reserves all rights" to seek an award of costs, fees, and other expenses, including attorney's fees and expenses under the Equal Access to Justice Act.  *See* Pl.'s Mem. at 22 n.8.  Defendants likewise reserve their right to respond if, and when, Plaintiff applies for such an award.

[3] Specifically, Plaintiff's Complaint requests: (i) a declaratory judgment determining Plaintiff is entitled to a refund from the United States Trustee Program (Count I); (ii) recovery of overpayments (Count II); (iii) avoidance and recovery of an unauthorized postpetition transfer under §§ 549 and 550 (Count III); and (iv) a judgment requiring the United States Trustee Program to disgorge any overpayments based on the equitable principle of unjust enrichment (Count IV). Compl. (Dkt. 1).

2. Plaintiff fails to appreciate that constitutional equal-treatment violations are not automatically entitled to a retrospective remedy. Instead, "[the Court] must adopt the remedial course Congress likely would have chosen 'had it been apprised of the constitutional infirmity.'" *Siegel*, 142 S. Ct. at 1701 (quoting *Levin v. Commerce Energy, Inc.,* 560 U.S. 413, 427 (2010)).

3. The appropriate remedy for the lack of uniformity identified in *Siegel* is one that restores uniformity to the bankruptcy laws. Congress has already provided this remedy by amending its bankruptcy fee laws in 2021 to ensure that the quarterly fees charged to chapter 11 debtors apply equally in all States. This prospective remedy is constitutionally sufficient, furthers congressional intent, and protects the reliance interests of debtors in Alabama and North Carolina who paid quarterly fees based on the fee schedules in place at the time of the non-uniformity. Limiting relief to the prospective uniformity that Congress adopted is consistent with both the history of the quarterly fee assessments from its inception and applicable Supreme Court caselaw. No further remedy is required.

4. To the extent retrospective relief is required, the only appropriate remedy is charging additional fees in the (likely few) chapter 11 cases in North Carolina and Alabama in which there were disbursements that qualified for the fee increase. As the Supreme Court has previously directed, if a law is determined to be constitutionally infirm because of unequal treatment, the law is remedied by "'a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 73 (2017) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)). In determining whether to extend the benefit to all or to

withdraw the benefit from the favored class, this Court "must adopt the remedial course Congress likely would have chosen 'had it been apprised of the constitutional infirmity.'" *Id*. at 73-74 (quoting *Levin*, 560 U.S. at 427).

5.      Here, there is no question that Congress would have applied the fee increase to all judicial districts, exactly as it mandated in its 2021 amendment and, as *Siegel* noted, as Congress expected would happen when it issued its 2017 amendment.  142 S. Ct. at 1782 n.2.  This remedy is thus consistent with Congressional intent and will not shift the costs from debtors to taxpayers.  The relief sought by Plaintiff, a disgorgement of fees paid by chapter 11 debtors in forty-eight States during a three-year period, is contrary to Congressional intent and would unfairly burden taxpayers who will have to cover the shortfall.

6.      For the reasons discussed below, this Court should decline to order any payment to Plaintiff and grant summary judgment in Defendants' favor on all counts.

## STATEMENT OF FACTS

**1.      Bankruptcy Cases are Administered by the Executive Branch under the Trustee Program in 88 Districts; in 6 Districts, Bankruptcy Cases are Administered by the Judicial Branch under the Administrator Program.**

7.      In eighty-eight federal judicial districts spanning forty-eight States, bankruptcy cases are administered by United States Trustees ("**U.S. Trustees**") appointed and overseen by the United States Department of Justice, and thus are administered by the executive branch of the United States Government.  *See Siegel*, 142 S. Ct. at 1776.  This program is commonly known as the United States Trustee Program ("**Trustee Program**").

8.      In six federal judicial districts spanning Alabama and North Carolina, bankruptcy cases are administered by bankruptcy administrators ("**Bankruptcy Administrators**") appointed and overseen by the United States Courts, and thus are administered by the judicial branch of the

United States Government.  *See Siegel*, 142 S. Ct. at 1776.  This program is commonly known as

the "**Administrator Program**."

9.    Prior to 1978, all bankruptcy cases were administrated by the judicial branch.

Bankruptcy referees, in addition to judicial responsibilities, "dealt with an array of administrative

tasks, such as appointing private trustees where appropriate; organizing creditors' committees;

supervising the filing of required reports, schedules, and taxes; and monitoring cases for signs of

abuse and fraud."  *Siegel*, 142 S. Ct. at 1775.

10.    In 1978, Congress, concerned that the administrative responsibilities were over-

loading bankruptcy judges and creating the appearance of bias, piloted the Trustee Program in 18

of the 94 federal judicial districts.  Under the pilot Trustee Program, "the administrative func-

tions previously handled by the bankruptcy courts [were transferred] to newly created U. S. Trus-

tees, housed within the Department of Justice rather than the Administrative Office of the U. S.

Courts."  *Siegel*, 142 S. Ct. at 1776; *see also* Bankruptcy Reform Act of 1978, Pub. L. No. 95-

598, 92 Stat. 2549.

11.    In 1986, Congress expanded the Trustee Program to all federal judicial districts

other than the six judicial districts in North Carolina and Alabama.  *Siegel*, 142 S. Ct. at 1776.  In

those two states, the administrative functions of bankruptcy cases were handled by the Adminis-

trator Program.  *Siegel*, 142 S. Ct. at 1776.  Congress provided, however, that North Carolina and

Alabama would be required to join the Trustee Program by October 1, 1992.  *Siegel*, 142 S. Ct.

at 1776; *see also* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act

of 1986, Pub. L. No. 99-554, § 302, 100 Stat. 3088, 3121-3123 (1986).

12.     In 1990, at the urging of the Judicial Conference, Congress extended the deadline

for North Carolina and Alabama to join the Trustee Program for an additional 10 years, until Oc-

tober 1, 2002.  *See* Federal Courts Study Committee Implementation Act of 1990, Pub. L. No.

101-650, Tit. III, § 317, 104 Stat. 5115; Judicial Conference of the U.S., *Report of the Proceed-*

*ings of the Judicial Conference of the United States* 13 (Mar. 13, 1990),

https://go.usa.gov/xFVfK.

13.     "At the end of those 10 years, however, Congress did not phase out the Adminis-

trator Program.  Instead, it eliminated the sunset period and permanently exempted the six dis-

tricts from the requirement to transition to the Trustee Program, while providing that each district

could individually elect to do so."  *Siegel*, 142 S. Ct. at 1776; *see also* Federal Courts Improve-

ment Act of 2000, Pub. L. No. 106-518, § 501, 114 Stat. 2421-2422; Bankruptcy Judges, United

States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, § 302(d)(3),

100 Stat. 3121-3123 (28 U.S.C. 581 note).

14.     To date, the six districts in North Carolina and Alabama have not elected to tran-

sition into the Trustee Program and their bankruptcy cases continue to be administered by Bank-

ruptcy Administrators appointed and managed by the United States Courts.

**2.      Congress Established Chapter 11 Quarterly Fees to Avoid Burdening Taxpayers**
**with the Costs of Administering Bankruptcy Cases.**

15.     At the time Congress created the Trustee Program and expanded it to forty-eight

states, Congress intended that it would be "self-funding" and "paid for by the users of the bank-

ruptcy system—not by the taxpayer."  H.R. Rep. No. 99-764, at 22 (1986).  Congress requires

that the Trustee Program be funded in its entirety by user fees paid to "a special fund," the

United States Trustee System Fund in the Treasury of the United States ("**UST Fund**"), "the

bulk of which are paid by debtors who file cases under Chapter 11 of the Bankruptcy Code."
*Siegel*, 142 S. Ct. at 1776; *see also* 28 U.S.C. §§ 589a(b)(5), 1930(a)(6)(A).

16.     Under 28 U.S.C. § 1930(a)(6), quarterly fees must be paid to the UST Fund during the pendency of chapter 11 cases.  Quarterly fees are graduated according to the amounts of disbursements made by or on behalf of chapter 11 debtors in each quarter that their cases remain open.  28 U.S.C. § 1930(a)(6).

17.     The quarterly fees collected from chapter 11 debtors fund most of the costs of the Trustee Program.  *Siegel*, 142 S. Ct. at 1776.

**3.      When Congress Added Subsection (a)(7) to 28 U.S.C § 1930, It Intended that Chapter 11 Debtors in Administrator Program Districts Would Pay Quarterly Fees Equal to Those Paid by Debtors in Trustee Program Districts.**

18.     Initially, chapter 11 debtors in Administrator Districts were not required to pay any quarterly fees.  *Siegel*, 142 S. Ct. at 1776.

19.     In the mid-1990s, the United States Court of Appeals for the Ninth Circuit addressed a constitutional uniformity challenge to this fee discrepancy by a debtor in California, who asserted that it should not be required to pay quarterly fees that chapter 11 debtors in North Carolina or Alabama did not have to pay.  *See St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1532-33 (9th Cir. 1994), *amended*, 46 F.3d 969 (9th Cir. 1995).  Agreeing that there was a constitutional infirmity, the Ninth Circuit held invalid the 10-year extension of the deadline for the Administrator Program districts to join the Trustee Program.  *Id*. at 1534.  But, notwithstanding its holding, the Ninth Circuit declined to excuse the debtor from paying quarterly fees.  *Id*. at 1534.

20.     In 2000, expressly in response to *Victoria Farms* and as proposed by the Judicial Conference of the United States ("**Judicial Conference**"), Congress amended section 1930 to add subsection (a)(7) which provided that, with respect to Administrator Program districts, "the

Judicial Conference of the United States may require the debtor in a case under chapter 11 . . . to pay fees equal to those imposed by paragraph (6) of this subsection." Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, § 105, 114 Stat. 2412; *see Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal Courts Improvement Act of 1999: Hearing Before the Subcomm. on Courts and Intellectual Property of the House Comm. on the Judiciary on H.R. 2112 and H.R. 1752*, 106th Cong., 1st Sess. 26 (1999) (noting the Judicial Conference's determination that "implementing the establishment of chapter 11 quarterly fees in the bankruptcy administrator districts would eliminate any *Victoria Farms* problem"); Judicial Conference of the U.S., *Report of the Proceedings of the Judicial Conference of the United States* 45 (Sept./Oct. 2001) ("**2001 JCUS Report**"), https://www.uscourts.gov/sites/default/files/2001-09_0.pdf.

4.    **The Judicial Conference's Standing Order Required Administrator Program Districts to Charge Quarterly Fees Equal to Those Charged in Trustee Program Districts; Administrator Program Districts Matched Those Fees and Fees Increases for Seventeen Years.**

21.    In 2001, the Judicial Conference adopted a standing order ("**2001 JCUS Order**") that directed quarterly fees "be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time." *2001 JCUS Report* at 46.

22.    For seventeen years, from 2001 through the end of 2017, the Administrator Program districts complied with the 2001 JCUS Order and collected quarterly fees equal to those collected in Trustee Program districts, including matching all fee increases. *Siegel*, 142 S. Ct. at 1777.

**5.    In 2017, Congress Increased Quarterly Fees in Trustee Program Districts to Avoid Burdening Taxpayers with Any Funding Shortfall; Administrator Program Districts Failed to Match the Fee Increases Despite the 2001 JCUS Order Remaining in Effect and Binding Upon Judicial Branch Employees Under 28 U.S.C. § 331.**

23.    In the mid-2010s, deposits in the UST Fund substantially decreased, and by fiscal year 2017 its balance had fallen to the point where the Trustee Program's costs could no longer be fully offset by user fees, risking requiring reliance on taxpayer funds. *See* H.R. Rep. No. 115-130, at 7 (2017).  To prevent taxpayers being burdened with the costs of administering bankruptcy cases, Congress passed the Bankruptcy Judgeship Act of 2017 ("**2017 Act**"), Pub. L. No. 115-72, Div. B, 131 Stat. 1224, 1229, to bolster the UST Fund by temporarily increasing quarterly fees in larger chapter 11 cases. *Siegel*, 142 S. Ct. at 1777.  The 2017 Act amended section 1930(a)(6) to temporarily increase the fees charged to chapter 11 debtors with quarterly disbursements of $1 million or more.  2017 Act § 1004, 131 Stat. 1232.  It also authorized 18 temporary bankruptcy judgeships and, to offset the judgeships' cost to taxpayers, directed that 2% of the temporarily increased quarterly fees would be "deposited in the general fund of the Treasury." 2017 Act §§ 1002, 1003, 1004(b)(1)-(2), 131 Stat. at 1229-32; H.R. Rep. No. 115-130, at 7-8. "[B]ased on informal estimates by [the Congressional Budget Office]," the 2017 Act was expected to increase revenues "by an amount sufficient to fully offset the increases in direct spending caused by the bill." *Id*. at 9.  The increased quarterly fees took effect in the first quarter of 2018. *See* 2017 Act § 1004(c), 131 Stat. 1232.

24.    By operation of the 2001 JCUS Order, the Administrator Program districts were required to match the 2018 Fee Schedule effective January 1, 2018. *2001 JCUS Report at* 46.  Indeed, 28 U.S.C. § 331 provides:

> All judicial officers and employees of the United States shall promptly carry into effect all orders of the Judicial Conference or the standing committee established pursuant to this section.

25.     Despite the 2001 JCUS Order requiring nationwide equal fees, and unlike with previous fee increases, the Administrator Program districts did not immediately adopt the 2018 Fee Schedule.  *Siegel*, 142 S. Ct. at 1777.

26.     As the Supreme Court noted, the failure of the Administrator Program districts to adopt the 2018 Fee Schedule was contrary to Congress's expectation that "when it passed the 2017 Act, that the Judicial Conference would impose the same fee increase" in the Administrator Program districts.  *Id.* at 1782 n.2.

27.     In September 2018, the Judicial Conference directed the Administrator Program districts to match the 2018 Fee Schedule, but only for "cases filed on or after" October 1, 2018. Judicial Conference of the U.S., *Report of the Proceedings of the Judicial Conference of the United States* 11-12 (Sept. 13, 2018),[4] *see also Siegel*, 142 S. Ct. at 1777 ("Only in September 2018 did the Judicial Conference order the [BA] districts to implement the amended fee.").  In imposing that delayed effective date, the Judicial Conference did not explain why it was departing from its 2001 standing order.

**6.     In 2021, Congress Amended 28 U.S.C. § 1930(a)(7) to Ensure Uniformity.**

28.     In 2021, after some courts held that quarterly fees under the 2018 Fee Schedule were unconstitutionally non-uniform, *see*, *e.g.*, *In re Buffets, LLC*, 597 B.R. 588, 594 (Bankr. W.D. Tex. 2019), *rev'd and remanded*, 979 F.3d 366 (5th Cir. 2020), Congress enacted clarifying legislation amending section 1930(a)(7) to provide that the Judicial Conference "***shall require***" chapter 11 debtors in Administrator Program district to pay fees equal to those imposed by section 1930(a)(6).  *See* Bankruptcy Administration Improvement Act of 2020, Pub. L. No. 116-325, § 3(d)(2), 134 Stat. 5086, 5088 (2021) (emphasis added) ("**2021 Act**").  Section

---

[4] https://www.uscourts.gov/sites/default/files/2018-09_proceedings.pdf

2(a)(4)(B) of the 2021 Act explained that this change was made to "confirm the longstanding intention of Congress that quarterly fee requirements remain consistent across all Federal judicial districts." *Id*. § 2(a)(4)(B).  The 2021 Act also amended the fee schedule, extended temporary bankruptcy judgeships, and provided that certain amounts would either be deposited in the general fund for the Treasury or in a special fund for compensating chapter 7 trustees.  *See* 2021 Act § 3(b); 28 U.S.C. § 589a(f).

29.    Each of the bankruptcy administrators in the Administrator Program districts have announced the 2021 Fee Schedule.

**7.    In *Siegel*, the Supreme Court Held That Exempting Debtors in Two States from the 2017 Fee Increase Violated the Uniformity Requirement But Remanded the Question of Remedy.**

30.    On June 6, 2022, the Supreme Court held that the uniformity requirement of the Bankruptcy Clause "prohibits Congress from arbitrarily burdening only one set of debtors with a more onerous funding mechanism than that which applies to debtors in other States" and held the 2017 Act's fee increase was unconstitutionally non-uniform because it did not expressly and directly apply to debtors in all 50 States.  *Siegel*, 142 S. Ct. at 1782-83.  But the Supreme Court declined to decide what, if any, remedy was warranted for that oversight.  *Id.* at 1783.[5]

31.    In *Siegel*, the remedy issue was actively debated before the Supreme Court entered its decision.  *See generally* Arg't Tr. 29-45, 67-73, 78-85, 88, *Siegel v. Fitzgerald*, No. 21-

---

[5] *Siegel*, 142 S. Ct. at 1783 ("The parties dispute the appropriate remedy.  Petitioner seeks a full refund of fees that it paid during the nonuniform period.  Respondent argues that any remedy should apply only prospectively or should result in a fee increase for debtors who paid less in the Administrator Program districts.  The parties raise a host of legal and administrative concerns with each of the remedies proposed, including the practicality, feasibility, and equities of each proposal; their costs; and potential waivers by nonobjecting debtors.  The court below, however, has not yet had an opportunity to address these issues or their relevancy to the proper remedy.  Mindful that we are a court of review, not of first view, this Court remands for the Fourth Circuit to consider these questions in the first instance.") (internal quotes and citations omitted).

441 (Apr. 18, 2022).[6]  The Solicitor General argued that it would be constitutionally sufficient to remedy the lack of uniformity on a prospective basis only—and Congress already provided that remedy in the 2021 Act.  Brief for the Respondent at *45-48, *Siegel v. Fitzgerald*, No. 21-441, 2022 WL 943378 (U.S. Mar. 1, 2022).  Moreover, she argued that even if a retrospective remedy were required, Supreme Court precedent holds that equality may be restored either by extending or by eliminating favorable treatment, and the selection of the appropriate remedy must turn on congressional intent.  *Id*. at *43-44.  The Solicitor General suggested that Congress's desire to avoid the burden of a looming shortfall in the UST Fund and its subsequent clarifying legislation confirming the application of increased fees in the six Administrator Program districts demonstrated that the uniform remedy Congress would select would be an equal fee increase across all 94 districts, not a repayment of fees in the 88 Program districts, which would effectively nullify the 2017 amendment.  *Id*. at *44-48.

32.     The Court ultimately remanded the question to the Fourth Circuit to consider it in the first instance.  142 S. Ct. at 1783.  In addition to other considerations potentially bearing upon the remedial analysis, the Court noted that there is "ample evidence that Congress likely understood, when it passed the 2017 Act, that the Judicial Conference would impose the same fee increase."  *Id.* at 1782 n.2.  Separately, in light of its decision in *Siegel*, the Supreme Court vacated and remanded decisions by the Second, Tenth, and Eleventh Circuits.

**8.      Prior to *Siegel* Decision, Debtors and Plaintiff Paid Quarterly Fees Without Dispute.**

33.     On December 4, 2017 ("Petition Date"), Woodbridge Group of Companies, LLC and certain if its affiliates ("Woodbridge") filed voluntary chapter 11 petitions in this Court.

---

[6] Available at https://perma.cc/6M8A-Y87E.

Other affiliates (collectively, together with Woodbridge, the "Debtors") also filed voluntary chapter 11 petitions within the following four months.

34.     On March 8, 2018, the Debtors filed the First Amended Plan of Liquidation (the "Plan").  Bankruptcy Case, ECF No. 2903.

35.     On October 26, 2018, the Court entered an order confirming the Plan.  Bankruptcy Case, ECF No. 3421.

36.     On February 15, 2019, the Plan became effective.  Bankruptcy Case, ECF No. 3421.

37.     On the Effective Date, the Plan installed Plaintiff as the Liquidation Trustee. Bankruptcy Case, ECF No. 2657-1.

38.     From the Petition Date through the effective date of their Plan, the Debtors paid quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) without dispute.

39.     From the Effective Date through the first quarter of 2019, Plaintiff paid quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) without dispute.

**9.     Plaintiff Seeks Repayment of Quarterly Fees After *Siegel*.**

40.     On December 29, 2022, following the Supreme Court's decision in *Siegel*, Plaintiff filed the current Complaint.  Adversary Proceeding, ECF No. 1.

41.     In the Complaint, Plaintiff ask the Court to: (i) enter a declaratory judgment that approximately $1,847,026.39 in quarterly fees paid by the Debtors and Plaintiff were improperly assessed and collected and should be refunded to the Liquidation Trust; (ii) enter a judgment against Defendants requiring Defendants to direct the UST Fund to immediately cause to be paid

to Plaintiff not less than $1,847,026.39 and (iii) award Plaintiff costs and expenses incurred in connection with the Adversary Proceeding. [7]  Complaint, p. 17.

**10.    Status of Post-*Siegel* Decisions on Remand.**

42.    On August 15, 2022, the Tenth Circuit on remand reinstated its original opinion. *In re John Q. Hammons Fall 2006, LLC*, No. 20-3203, 2022 WL 3354682 (10th Cir. Aug. 15, 2022), *reinstating* 15 F.4th 1011 (10th Cir. 2021).   The Tenth Circuit decision simply stated that: "Upon careful consideration of the parties' supplemental briefs and the Supreme Court's *Siegel* opinion, we reinstate our original opinion . . . We reverse and remand for determination of Appellants' quarterly Chapter 11 fees and a refund of overpayment consistent with our original opinion."  *Id.*  The Tenth Circuit's decision does not contain any additional analysis of the remedy issue or explanation of why the Tenth Circuit chose a monetary remedy.

43.    On November 10, 2022, the Second Circuit on remand issued an amended decision in which it reinstated its judgment that the 2017 Act violated the Bankruptcy Clause.  *In re Clinton Nurseries, Inc.*, 53 F.4th 15, 21 (2d Cir. 2022).   In its decision, the Second Circuit directed that the "Bankruptcy Court provide [the debtors] with a refund of the amount of quarterly fees paid in in excess of the amount [the debtors] would have paid in a BA District during the same time period."  *Id.* at 29.   The Second Circuit's decision includes an extensive analysis and explanation of why the 2017 Act was subject to and violated the Uniformity Requirement.  The

---

[7] Defendants, seeking to narrow issues in dispute, have undertaken a review of the fees paid during the relevant time period and identified $1,920,219 in fees responsive to the relief the Plaintiff asserts in this adversary proceeding.  Defendants invited the Plaintiff to stipulate to this figure, which is $73,192.61 greater than the amount identified in the Plaintiff's Motion for Summary Judgment, but as of the time of filing this Response/Motion, the parties have not finalized such agreement.  The Defendants would nonetheless view $1,920,219 as the amount in controversy under these circumstances.

Second Circuit's decision does not, however, include any additional legal analysis of the remedy issue or explanation of its decision to order monetary relief.

44.    On December 15, 2022, the Bankruptcy Court for the Eastern District of Virginia, on remand from the Fourth Circuit, ruled that the appropriate remedy was to require repayment of the disputed fees by the United States. *Siegel v. Fitzgerald (In re Circuit City Stores, Inc.)*, Adv. No. 19-20391-KRH, 2022 WL 17722849 (Bankr. E.D. Va. Dec. 15, 2022) ("Siegel II"). That ruling is on appeal; a petition for direct review has been granted by the Fourth Circuit. *See Fitzgerald v. Siegel (In re Cir. City Stores, Inc.)*, No. 23-135 (4th Cir. June 27, 2023) (granting petition for direct review); *see also Siegel v. Fitzgerald (In re Circuit City Stores, Inc.)*, No. 23-1678 (4th Cir.) (merits docket).  Merits briefing has begun under an accelerated briefing schedule.

45.    On June 23, 2023, the Eleventh Circuit on remand issued a decision in which it addressed the appropriate remedy for the constitutional violation the Supreme Court found in *Siegel*.  *United States Trustee Region 21 v. Bast Amron LLP (In re Mosaic Management Group, Inc.)*, 71 F.4th 1341 (11th Cir. 2023).  The Eleventh Circuit held that "the appropriate remedy in this case for the constitutional violation identified in *Siegel* is the refunds that the Debtors in this case seek." *Id.* at 1353-54.  In contrast to the decisions of the Second and Tenth Circuit, the Eleventh Circuit's decision includes an analysis of the remedy issue.  Nonetheless, for the reasons stated in section III, *infra*, Defendants believe the *Mosaic* court erred in holding that repayment of the disputed fees is the appropriate remedy.

46.    The Ninth Circuit in *USA Sales, Inc. v. Office of the United States Trustee*, 76 F.4th 1248, 1253-56 (9th Cir. Aug. 10, 2023), agreed with Eleventh Circuit's reasoning in *Mosaic* and found that repayment was appropriate.

**11.    Writ of Certiorari.**

47.    On June 23, 2023, the Solicitor General petitioned the Supreme Court of the

United States for a writ of certiorari to review the Tenth Circuit's order and judgment in *John Q.*

*Hammons Fall 2006, LLC*, 2022 WL 3354682.  The petition raises the question:

> Whether the appropriate remedy for the constitutional uniformity violation found
> by this Court in *Siegel* [*v. Fitzgerald*, 142 S. Ct. 1770 (2022)], is to require the
> United States Trustee to grant retrospective refunds of the increased fees paid by
> debtors in United States Trustee districts during the period of disuniformity, or is
> instead either to deem sufficient the prospective remedy adopted by Congress or
> to require the collection of additional fees from a much smaller number of debtors
> in Bankruptcy Administrator districts.

The petition has been docketed as *Office of the United States Trustee v. John Q. Hammons Fall*

*2006, LLC*, No. 22-1238 (U.S.).

48.    On July 14, 2023, the Solicitor General petitioned the Supreme Court for a writ of

certiorari to review the United States Court of Appeals for the Second Circuit's opinion and

judgment in *Clinton Nurseries, Inc. v. Harrington (In re Clinton Nurseries, Inc.)*, 53 F.4th 15 (2d

Cir. 2022).  The petition presents the same question as in *Hammons*.  The petition has been dock-

eted as *Harrington v. Clinton Nurseries, Inc.*, No. 23-47 (U.S.).

49.    As of the filing of this brief, the time for the government to seek a writ of certio-

rari from the decisions of the Eleventh and the Ninth Circuits has not yet lapsed.

**ARGUMENT**

**I.    LEGAL STANDARDS**

50.    Under Federal Rule of Civil Procedure 56, which is made applicable to this adver-

sary proceeding by Bankruptcy Rule 7056, summary judgment is appropriate where "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  This Court should deny the Plaintiff's motion for summary judg-

ment and grant the Defendants' motion for summary judgment because, for the reasons that fol-

low, a damages award is not the appropriate remedy for the Bankruptcy Clause violation identi-

fied in *Siegel*.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE A MONETARY AWARD IS NOT THE APPROPRIATE REMEDY FOR THE BANKRUPTCY CLAUSE VIOLATION IDENTIFIED IN *SIEGEL*.

### A.    The Constitutional Violation Is Fully Remedied Through Prospective Action.

51.    Congress has already corrected the constitutional defect that the Supreme Court

identified in *Siegel*.  Upon becoming aware of the BA districts' failure to collect the increased

fees and resulting litigation, Congress enacted legislation in 2021 that corrected that oversight by

expressly mandating that the Judicial Conference always charge the same fees that are being

charged in Trustee Program districts.  *See* Pub. L. No. 116-325, § 3(d)(2), 134 Stat. 5086, 5088.

That prospective remedy alone provides proper relief, and no retrospective remedy is required.

52.    *Siegel* does not require the restoration of uniformity between the Trustee and Ad-

ministrator Programs during the transitional non-uniform period.  The Supreme Court has previ-

ously recognized the ability of Congress to pass legislation that provides prospective relief but

leaves past unconstitutional inequality in place.  Thus, in *Heckler*, the Supreme Court affirmed

legislation that prospectively corrected unconstitutional gender discrimination in federal-benefits

payments but continued the discriminatory payments for five years past the legislative fix.  465

U.S. at 732-33.  Congress provided for this transition period "to protect the expectations of per-

sons, both men and women, who had planned their retirements based on [the pre-amendment]

law" that would have provided them with greater benefits.  *Id*. at 745.  The Court explained: "We

have recognized, in a number of contexts, the legitimacy of protecting reasonable reliance on

prior law even when that requires allowing an unconstitutional statute to remain in effect for a limited period of time." *Id*. at 746.

53.     Congress always intended that that the quarterly fees would be uniformly assessed across all judicial districts when it passed the 2017 Act. *Siegel*, 142 S. Ct. at 1782 n.2; *see also* 2021 Act § 2(a)(4)(B), 134 Stat. 5086. But it took some time for Congress to pass legislation to correct the divergent implementation of the quarterly fee schedule in the Administrator Program districts. *See* 2021 Act (approved Jan. 12, 2021). In doing so, Congress implicitly elected not to require the debtors in those districts, who had relied upon the fee schedule assessed by the Bankruptcy Administrators in the interim, to pay increased fees retroactively. As with *Heckler*, there is no constitutional barrier to Congress's provision of prospective-only relief. The transitional three-year lack of uniformity here is of shorter duration than that permitted in *Heckler*.

54.     Requiring that temporarily non-uniform quarterly fees be paid is also consistent with the past history of the statute. Several decades before *Siegel*, the Ninth Circuit upheld a uniformity challenge brought by a debtor in a Trustee District, when debtors in Administrator Program districts were not required to pay quarterly fees. *Victoria Farms*, 38 F.3d 1525. But it rejected the debtor's contention that it should be relieved from paying the quarterly fees as a remedy. The court concluded that the proper resolution was to sever the provision that exempted the six Administrator Program districts from the Trustee Program, and it held that the debtor remained liable for the challenged fees. *Id*. at 1535. It did so even though any act to make the system uniform would undoubtedly take time. *Cf. In re Prines*, 867 F.2d 478, 484-85 (8th Cir. 1989) (upholding staggered assessments of quarterly fees during roll-out of Trustee Program against equal protection challenge even if there was "unequal treatment" across districts during implementation).

55.    Prospective relief here is consistent with constitutional jurisprudence.  The Supreme Court has recently reaffirmed that establishing a constitutional equal-treatment violation does not necessarily entitle the plaintiff to individual, retrospective relief.  *See Morales-Santana*, 582 U.S. at 54-77.  In *Morales-Santana*, the Supreme Court held unconstitutional a statute that afforded more favorable citizenship rules to children born abroad of U.S.-citizen mothers compared to those of U.S.-citizen fathers.  *Id*. at 72.  Despite the equal protection violations, the Court allowed only "prospective[]" relief, neither granting citizenship to the plaintiff nor retracting the citizenship others had obtained from the unconstitutionally favorable exception.  *Id*. at 72-76.  In so doing, the Court acknowledged the government's briefs, *id*. at 76, which had cited the protection of "reliance interests" of those who benefited from the past inequality as support for imposing a prospective remedy.  *See* Reply Brief for Petitioner at 19 n.3, *Sessions v. Morales-Santana*, 582 U.S. 47 (2017) (No. 15-1191), 2016 WL 6472054 at *19 (citing *Heckler*, 465 U.S. at 745-50).

56.    Similarly, in *Barr v. American Association of Political Consultants* (*AAPC*), 140 S. Ct. 2335 (2020), the plaintiffs successfully challenged a narrow exception to a general statutory prohibition against robocalls.  As a remedy, plaintiffs demanded that the favorable treatment (ability to make robocalls) be extended generally.  *Id.* at 2348 (plurality op.).  Recognizing the case involved an "equal-treatment constitutional violation," the Court's plurality chose to sever the "discriminatory exception," a remedy that "cures the unequal treatment," and left "in place the longstanding robocall restriction."  *Id.* at 2354-55.  The Court not only refused to extend the more favorable treatment to plaintiffs, but also permitted only prospective relief.  It neither retrospectively created liability for those previously excepted from the prohibition nor retro-

spectively "negate[d] the liability of parties who made robocalls covered by the robocall re-striction." *Id.* at 2355 n.12 (plurality op.); *see id.* at 2363 (Breyer, J., concurring in judgment with respect to severability).[8]  The plurality determined that its prospective-only approach to the proper remedy was "constitutional, stable, predictable, and commonsensical." *Id.* at 2356.

B.    **Plaintiff's Dissatisfaction with the Remedy Provided by Congress Is Not Grounds to Contravene Congress's Preferred Remedy.**

57.    The proper remedy for the constitutional defect identified in *Siegel* is a prospec-tive mandate of equal treatment—the same relief awarded in *Morales-Santana*, *AAPC*, and *Victoria Farms*.  And Congress has already provided that relief with the 2021 Act.  The fact that Congress already implemented the very relief to which Plaintiff is entitled does not mean that he can now obtain even more.  On the contrary, this Court should respect Congress's judgment that the appropriate remedy here is prospective reform of the system, not a retrospective unwinding of years of completed fee payments.  *Cf. Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006) ("[T]he touchstone for any decision about remedy is legislative intent.").

58.    "[T]he question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts."  *Egbert v. Boule*, 142 S. Ct. 1793, 1807 (2022) (declining to recognize *Bivens* action where Congress provided alternative remedy).  Congress determined that a prospective remedy was adequate here.

59.    The Bankruptcy Clause does not mandate action by this Court to undo every past instance of unequal quarterly fee assessment.  For example, an equal-protection violation is fully

---

[8] *But see Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 527 n.1 (6th Cir. 2021) (opining this portion of *AAPC* is *dicta*); *Franklin v. Navient, Inc.*, 534 F. Supp. 3d 341, 343-44, 347 (D. Del. 2021) (same; holding government debt collectors may be liable for actual damages but due process de-fense precluded punitive damages for pre-*AAPC* calls), *as amended* No. 1:17-cv-1640, 2021 WL 2915033 (D. Del. July 12, 2021).

remedied by repeal of the discriminatory statute, even though past instances of unequal treatment remained uncorrected. *See, e.g.*, *U.S. Dep't of the Treasury v. Galioto*, 477 U.S. 556, 559-60 (1986) (plaintiff's "equal protection" claim became moot upon Congress's amendment of challenged statute); *cf. Orr v. Orr*, 440 U.S. 268, 272 (1979) (recognizing that discriminatory Alabama divorce law that required only husbands to pay alimony could be validated by amendment extending alimony obligations to wives and, if so, petitioner "would remain obligated to his wife"). A rewriting of history is not required for past violations of constitutional equal-treatment guarantees. It would be quite odd if the Bankruptcy Clause, uniquely among constitutional protections, were interpreted to guarantee a retrospective monetary remedy for inequality.

60.     "The Constitution does not demand an individually effective remedy for every constitutional violation." *Zehner v. Trigg*, 133 F.3d 459, 462 (7th Cir. 1997). That follows in part from the understanding that plaintiffs have Article III standing to challenge "discriminatory statutes or practices even when the government could deprive a successful plaintiff of any monetary relief by withdrawing the statute's benefits from both the favored and the excluded class." *Heckler*, 465 U.S. at 739. Thus, constitutional litigation often proceeds to the merits even where (as here) individual plaintiff-based relief is ultimately unavailable. *See id*. at 740 n.8 ("[V]ictims of a discriminatory government program may be remedied by an end to preferential treatment for others."); *AAPC*, 140 S. Ct. at 2355 (plurality op.) ("[A] plaintiff who suffers unequal treatment has standing to seek 'withdrawal of benefits from the favored class.'") (quoting *Heckler*, 465 U.S. at 737-40).

61.     Indeed, for constitutional violations, retrospective monetary relief is rarely available at all. A successful plaintiff can obtain "affirmative monetary recovery" from the United

States only to the extent that it can identify an express waiver of sovereign immunity by Congress. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-35 (1992). Likewise, Congress has never authorized an award of damages for constitutional violations against individual federal officials, and such a remedy generally cannot be judicially implied. *See Egbert*, 142 S. Ct. at 1802-04.

62. The Supreme Court has recognized the ability of a legislature to provide a prospective only remedy even where an unconstitutional tax was assessed, as long as due process was satisfied. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 100 (1993) ("federal law does not necessarily entitle [the taxpayers] to a refund"). As the Supreme Court explained, where a state tax statute is held unconstitutional, a state must provide "meaningful backward-looking relief" (either by granting a refund to disfavored taxpayers or by collecting additional taxes from favored taxpayers) only if a taxpayer made the payment "under duress." *Id.* at 101 & n.10 (1993). But it has also made clear that such retrospective relief is only required if the State did not offer any "meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing." *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 38 n.21 (1990). Where a plaintiff makes payment despite having had such a prior opportunity, "recovery of that payment may be denied" without running afoul of the Due Process Clause. *Id.* (quotation marks omitted); *accord Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 656-57 (1994); *Harper*, 509 U.S. at 101.

63. This is not a case where payment was compelled without due process. Unlike in *McKesson*, there was no impediment to Plaintiff seeking an injunction against application of the 2017 Act's increased fees or a declaration regarding his fee obligation. *See Cranberry Growers Coop. v. Layng*, 930 F.3d 844, 847 (7th Cir. 2019) (debtor refused to pay fees and filed objection

after receiving a notice of unpaid fees); *cf. Railway Labor Executives' Assn. v. Gibbons*, 455 U.S. 457, 462, 465 (1982) (estate trustee sought to enjoin application of statute that Court held violated the uniformity requirement of the Bankruptcy Clause).  Plaintiff also could have withheld payment and challenged the 2017 Act in defense of any enforcement proceeding, which would have afforded Plaintiff due process.  *See*, *e.g.*, 11 U.S.C. § 1112(b) (providing for notice and hearing before dismissal or conversion).  Because there were prior opportunities for Plaintiff to challenge the 2017 Act's validity, the Due Process clause does not mandate recovery of money here.  *See McKesson*, 496 U.S. at 38 n.21.  The Constitution does not compel retrospective relief in these circumstances.

### III.    TO THE EXTENT A RETROSPECTIVE REMEDY IS REQUIRED, THE REMEDY IS EXTENSION OF THE MAIN RULE—THE 2017 ACT'S FEE INCREASE.

#### A.    The Appropriate Retrospective Remedy Must Reflect Congressional Intent.

64.    Even if backward-looking relief were warranted, the relief that Plaintiff requests is not the appropriate remedy.  Instead, the proper course would be to establish equal treatment by extension of the main rule—the 2017 Act's fee increase—to the six Administrator Program districts.  There is no basis for issuing a remedy that effectively provides a windfall to Plaintiff because of the Bankruptcy Administrators' delay in imposing the 2018 Fee Schedule.

65.    "[W]hen the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment," but the "Constitution is silent" as to "[h]ow [that] equality is accomplished."  *Morales-Santana*, 582 U.S. at 73 (internal quotation marks omitted).  Where, as here, a statute unconstitutionally "benefit[ed] one class" while "exclud[ing] another from the benefit," "[t]here are 'two remedial alternatives.'"  *Id*. at 72 (quoting *Califano v. Westcott*, 443 U.S. 76, 89 (1979)).  Equality can be restored either by "withdrawal of benefits from the favored class" or by "extension of benefits to the excluded class."  *Id*. at 73 (quoting *Heckler*, 465 U.S. at

740); *see Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 569 (2015) (government "can cure the violation by either 'leveling up' or 'leveling down'").

66.    The Plaintiff's preferred remedy does not determine what remedy is appropriate. *Levin*, 560 U.S. at 427.  Instead, "[t]he choice between these outcomes is governed by the legislature's intent," and the Court "*must* adopt the remedial course Congress likely would have chosen 'had it been apprised of the constitutional infirmity.'" *Morales-Santana*, 582 U.S. at 77 (emphasis added).

67.    To ascertain what Congress "would have willed," the Court considers both "the intensity of [Congress's] commitment to the residual policy"—i.e., the general rule—and "the degree of potential disruption of the statutory scheme that would occur" by extending favorable treatment to the plaintiff as opposed to withdrawing it from others. *Morales-Santana*, 582 U.S. at 75 (citation omitted) (quoting *Welsh v. United States*, 398 U.S. 333, 365 (1970) (Harlan, J., concurring)).

68.    Where the unconstitutionality lies in a favorable exception to the general rule, "the general rule . . . applicable to a substantial majority . . . must hold sway." *Morales-Santana*, 582 U.S. at 77.

69.    The nature and purpose of the fees at issue reflects the remedy Congress would intend here.  Since the creation of the United States Trustee Program, Congress has legislated to ensure that its costs are borne "by the users of the bankruptcy system—not by the taxpayer." H.R. Rep. No. 99-764, at 22 (1986).  Congress enacted the fee increase in the 2017 Act to counteract an imminent shortfall in user funds that threatened to shift significant financial liability to taxpayers at large.  That fee increase was the "general rule" applicable to a vast majority of districts and bankruptcy cases nationwide, while the lower fee schedules in the six Administrator

Program districts was briefly the small exception to that general rule.  *Cf. Morales-Santana*, 582 U.S. at 77 (extending "favorable treatment" would render it "the general rule [and] no longer an exception").

70.    Congress's commitment to this "general rule" is conclusively demonstrated by the fact it never intended any exception to exist.  As the Supreme Court recognized in *Siegel*, there is "ample evidence that Congress likely understood, when it passed the 2017 Act, that the Judicial Conference would impose the same fee increase."  142 S. Ct. at 1782 n.2; *see also* Arg't Tr. 30-34, 84 (Kavanaugh, J.) (suggesting that Administrator Program districts' failure to collect "equal fees" as mandated by Judicial Conference's own 2001 order was a "mistake" or "foul-up").  And the 2021 Act confirms that Congress saw fit to resolve the lack of uniformity by leveling up fees in Administrator Program districts to match Trustee Program levels, not to level down Trustee Program fees to the 2008 Fee Schedule.  *See* Pub. L. No. 116-325, § 3(d)(2), 134 Stat. 5086, 5088 (2021).

71.    The other key factor—the "degree of potential disruption of the statutory scheme that would occur" from implementing a particular remedy, *Morales-Santana*, 582 U.S. at 75 (quoting *Heckler*, 465 U.S. at 739 n.5)—weighs just as strongly against awarding Plaintiff's pre-ferred relief.  Granting monetary awards in Trustee Program districts would effectively repeal the 2017 Act, which Congress enacted for the clearly expressed purpose of ensuring adequate fund-ing for the bankruptcy system without resort to taxpayer funds.  Plaintiff's proposed remedy would nullify Congress's policy choices while "impos[ing] hardship on" taxpayers, "whom Con-gress plainly meant to protect" when enacting the 2017 Act.  *Califano*, 443 U.S. at 90.  Requiring the government to return potentially $324 million in quarterly fees would unfairly burden tax-payers with the costs of administering the debtors' bankruptcy cases in Trustee Program districts.

72.     Accordingly, the permissible retrospective remedy here is one that would elimi-

nate, insofar as possible, the inadvertently favorable treatment extended to debtors in the six Ad-

ministrator Program districts.  Applying the main rule rather than the exception is consistent with

the Supreme Court's holding in *Siegel* that the constitutional infirmity was caused by the stat-

ute's failure, before the 2021 Act, to "*require* the Judicial Conference to impose an equivalent

increase." 142 S. Ct. at 1782 n.2 (emphasis in original).  Under that main rule, Plaintiff is not en-

titled to monetary relief.

73.     That conclusion follows from the comparative impact of the residual policy (the

fee increase in the Trustee Program districts) relative to the exception (the Administrator Pro-

gram districts).  The six Administrator Program districts account for less than 3% of the chapter

11 filings while the other 88 districts account for more than 97% of the chapter 11 filings made

in 2018.[9]  Just as in *Morales-Santana*, a remedy should not "extend favorable treatment" from a

small group to the "substantial majority," thereby transforming the "exception" into the "general

rule."  582 U.S. at 77.

74.     This Court need not address in this proceeding the potential impact on other

parties of invalidating the Administrator Program districts exception to the 2017 Act.  *See*

*Lindenbaum*, 13 F.4th at 528 ("We must determine the legal rule that applies to the parties before

us.").  In *Morales-Santana*, for example, the Supreme Court refused to extend a statutory

exception to petitioner that would accord him citizenship.  582 U.S. at 51-52.  In doing so, the

Court did not suggest that invalidating the exception would require citizenship to be revoked

from those who previously benefited from it.  *Id*. at 51-52, 77.  Rather, it determined which legal

---

[9] *See* U.S. Bankruptcy Courts—Business and Nonbusiness Cases Commenced, by Chapter of the
Bankruptcy Code, During The 12-Month Period Ending December 31, 2018, Tbl. F-2,
https://www.uscourts.gov/sites/default/files/data_tables/bf_f2_1231.2018.pdf.

rule should apply—the main rule—and then applied that rule to petitioner.  This Court should do the same here.

75.     Thus, whether this Court has authority to direct the Bankruptcy Administrators to collect increased fees is not the standard in determining the appropriate remedy.  The controlling question is whether the remedy sought from this Court is consistent with the congressional scheme.  *See Ayotte*, 546 U.S. at 330 (directing that "a court cannot 'use its remedial powers to circumvent the intent of the legislature'" when addressing a conflict between a statute and the Constitution) (quoting *Califano*, 443 U.S. at 94).

76.     In any event, if a retrospective remedy is required, then collection of additional fees in the Administrator Program districts is achievable.  The Supreme Court could direct the Bankruptcy Administrators to order such relief.  In its petition for a writ of certiorari from the Tenth Circuit decision in *Office of the United States Trustee v. John Q. Hammons Fall 2006, LLC*, No. 22-1238 (U.S.), and as consistent with this Memorandum, the government has taken the position that, to the extent retrospective relief is required, the appropriate remedy is the collection of additional fees in the Administrator Program districts.

77.     A process already exists for collecting those fees, as Bankruptcy Administrators routinely refer unpaid fees to the Treasury Department for collection.[10]  Even if the collection effort is not "perfectly successful," "a good-faith effort to administer and enforce" a retroactive collection from those who made lower payments can "constitute adequate relief" for differential treatment.  *McKesson*, 496 U.S. at 41 n.23.  That principle is particularly salient here, where the

---

[10] *See*, *e.g.*, U.S. Bankruptcy Administrator for the Northern District of Alabama, *Instructions Concerning Chapter 11 Quarterly Fees* § V, https://perma.cc/WZK3-N3M6.

increased fees would need to be sought from only a miniscule fraction of chapter 11 debtors (*i.e.*, the largest debtors among fewer than 3% of chapter 11 debtors nationwide).

78.     Any practical difficulties in enforcing those actions are not a constitutional barrier to the appropriate remedy.  The Bankruptcy Clause requires only a uniform law, and not uniform collection.  U.S. Const. art. 1, § 8, cl. 4 ("The Congress shall have Power . . . To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States"); *cf. Rosenberg v. United States*, 72 Fed. Cl. 387, 395-96 (Fed. Cl. 2006) (holding that complaint alleging that IRS engaged in "ultra vires and nonuniform collection" of a tax did not allege a violation of the tax uniformity clause, U.S. Const. art. I, § 8, cl. 1, because "[t]he Uniformity Clause . . . is a limitation on legislative, not executive, action"); *Peony Park v. O'Malley*, 121 F. Supp. 690 (D. Neb. 1954) (rejecting tax uniformity challenge where statute was uniform but enforcement was not), *aff'd*, 223 F.2d 668 (8th Cir. 1955).

79.     Where, as here, a plaintiff "challenge[s] a discriminatory exception that favors others," *AAPC*, 140 S. Ct. at 2355 (plurality op.), a successful plaintiff will often not obtain individual relief.  If Congress wished to authorize a monetary remedy for the constitutional violation that occurred here, it could have done so.  But the Constitution does not require it, and this Court should not impose a remedy that so clearly contravenes Congress's intent.[11]

---

[11] Because monetary relief is not the appropriate remedy for the Constitutional violation identified in *Siegel*, Defendants are entitled to summary judgment on all of Plaintiff's claims.  Defendants are entitled to judgment on Counts III and IV for the additional reasons that Plaintiff failed to assert his claim under section 549 and 550 (Count III) within the time required by 11 U.S.C. § 549(d) and Plaintiff's claim of unjust enrichment (Count IV) is barred by sovereign immunity. First, under section 549(d) "[a]n action or proceeding under this section may not be commenced after the earlier of . . . (1) two years after the date of the transfer sought to be avoided; or (2) the time the case is closed or dismissed."  11 U.S.C. § 549(d).  Here, Plaintiff made the alleged overpayments under the 2017 Act in 2018 and 2019.  But he did not commence this adversary proceeding until December 2022—over four years after the initial payment.  Any claim that the

80.     Contrary to Plaintiff's assertion, the refund mechanism for addressing overpay-
ments of quarterly fees that Congress included in its appropriations for the United States Trustee
Program provides no indication that Congress contemplated a monetary remedy in these circum-
stances. *See* Pl.'s Mem. at ¶¶ 46-47.  The appropriations proviso, reenacted annually since 1987,
that "notwithstanding any other provision of law, deposits … to the United States Trustee Sys-
tem Fund and amounts herein appropriated shall be available in such amounts as may be neces-
sary to pay refunds due depositors," Consolidated Appropriations Act, 2023, Pub. L. No. 117-
328, div. B, tit. II, 136 Stat. 4459, 4524 (2022), was discussed in an explanatory statement ac-
companying the legislation:

> Availability of Refunds Due to Depositors.— The reference to the phrase "re-
> funds due to depositors" in the appropriation of the United States Trustee System
> Fund is intended to apply to programmatic refunds payable in the ordinary course.
> These would include refunds that come due under the ordinary operation of the
> fee statute as enacted by Congress and administered by the United States Trustee
> Program, such as refunds due to adjustments between a debtor's estimated and ac-
> tual quarterly expenditures.  The phrase is not intended to apply to final judg-
> ments, awards, compromise settlements, and any interest and costs specified in
> the judgments or interest and costs otherwise authorized by law.

---

quarterly fees were an unauthorized transfer of property of the estate under section 549 are there-
fore time-barred. *Compare with Siegel II*, 2022 WL 17722849, at *6 n.11 (observing that
"[t]hese Adversary Proceedings were commenced by the filing of the Motion to Determine on
March 28, 2019, Mot. to Determine at 14, Adv. Pro. No. 19-03060, ECF No. 1 at 16, well within
two years after the date of the Unconstitutional Overpayment, *see* 11 U.S.C. § 549(d)").  Second,
it is axiomatic that the United States and its agencies and officers are immune from suit unless
they have consented to be sued.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *United States v.
Mitchell*, 445 U.S. 535, 538 (1980).  Such consent can be effected only by an express and une-
quivocal waiver of sovereign immunity by Congress and cannot be implied.  *Lane v. Pena*, 518
U.S. 187, 192 (1996); *Mitchell*, 445 U.S. at 538; *Beneficial Consumer Disc. Co. v. Poltonowicz*,
47 F.3d 91, 93-94 (3d Cir. 1995).  The United States has not waived sovereign immunity for un-
just enrichment claims.  *See United States v. 30,006.25 in U.S. Currency*, 236 F.3d 610, 613, 614
(10th Cir. 2000) ("[W]e [are not] aware of any general waiver of sovereign immunity for unjust
enrichment claims.  Moreover, fairness or policy reasons cannot by themselves waive sovereign
immunity.") (quoted in *United States v. Craig*, 694 F.3d 509, 513 (3d Cir. 2012)).  *But see
Conboy v. SBA*, 992 F.3d 153, 157 (3d Cir. 2021) (indicating that the Third Circuit has not ex-
plicitly addressed whether the United States has waived sovereign immunity as to unjust enrich-
ment claims).

168 Cong. Rec. S7819, S7920 (daily ed. Dec. 20, 2022).[12]  Congress's repeatedly reenacted authorization to "pay refunds due depositors" is thus intended to facilitate day-to-day operations (principally, to reconcile quarterly-fee charges using any updated disbursement data).  It does not direct a remedy for constitutional litigation.  Indeed, the statement reflects that the UST System Fund is not financially responsible for "final judgments [or] awards."

> **B.    At a Minimum, a Retrospective Remedy Does Not Apply to the Quarters When the Bankruptcy Administrators Violated the Still-Mandatory 2001 Judicial Conference Standing Order By Not Collecting Equal Fees.**

81.    Even if this Court believes repayment to the Plaintiff is the appropriate remedy (which it is not), it should not require a retrospective remedy for the first three quarters of calendar year 2018.  On January 1, 2018, when the 2017 amendment became effective, the 2001 JCUS Order "imposed in [BA] districts [quarterly fees] in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time."  2001 JCUS Report at 46.  Through this order, the Judicial Conference imposed in Administrator Program districts the increased fees of the 2017 Act as of its effective date because that was the amount "specified in 28 U.S.C. § 1930," as amended.  *Id*.  It did not impose different fees until it adopted the 2018 standing order.

82.    By statute, Bankruptcy Administrators were required to comply with the Judicial Conference's still-in-effect 2001 JCUS Order.  28 U.S.C. § 331 ("All judicial officers and employees of the United States shall promptly carry into effect all orders of the Judicial Conference.").  Thus, both the 2017 Act and the Judicial Conference imposed the same fees across all

---

[12] The explanatory statement "indicates congressional intent" and states that "[e]ach department agency funded in this act shall follow [its] directions" and "shall not reallocate resources or reorganize activities except as provided herein."  168 Cong. Rec. at S7898; *see* Pub. L. No. 117-328, § 4.

judicial districts—whether or not the Bankruptcy Administrators actually collected them—at least until the Judicial Conference's 2018 order imposed a different fee requirement. Because there was no disparity in the fees imposed prior to the 2018 Judicial Conference order, there is no need to equalize the fees imposed during that period, even if a retrospective remedy is otherwise required—which, for the reasons set forth in Section II, *supra*, it is not. The Bankruptcy Administrators' defiance of the Judicial Conference is no reason to require retrospective relief.

## IV.    THIS COURT SHOULD NOT FOLLOW THE ERRONEOUS DECISIONS OF THE SECOND, NINTH, TENTH, AND ELEVENTH CIRCUITS.

83.    The Defendants respectfully submit that the decisions of the Courts of Appeal for Second, Ninth, Tenth, and Eleventh Circuits are mistaken and should not be followed.

84.    With respect to the Second and Tenth Circuits, those decisions simply directed repayments, and failed to contain any post-*Siegel* legal analysis or explanation for choosing to impose a monetary remedy. Accordingly, the Defendants respectfully submit that those decisions have no value as persuasive precedent and should not be relied upon by this Court.

85.    With respect to the *Mosaic* decision, the Defendants respectfully submit that the Eleventh Circuit's decision was wrongly decided and should not be given persuasive value for the following reasons.

86.    First, the Eleventh Circuit erroneously relied on the court's lack of authority in that case to order the Judicial Conference or Bankruptcy Administrators to collect increased fees as a justification for granting a monetary remedy. *In re Mosaic Management Group, Inc.*, 71 F.4th at 1348. But no party sought such an order from the court. Rather, the only question before the court was whether the investment trustee was entitled to monetary relief, which turns on the legal question of whether the main rule of the 2017 Act or the exception that occurred in Administrator Program districts should be extended nationwide. Under Supreme Court precedent,

as acknowledged by *Mosaic*, *id*. at 1346, the answer to that level-up/level-down question turns on Congressional intent, not the vagaries of the relief requested or the chosen forum for the litigation.

87.     Second, the Eleventh Circuit erroneously held, based on *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239 (1931), that a refund is required because no action has yet been taken to collect increased fees in Administrator Program districts. *Mosaic*, 71 F.4th at 1348.  But this fails to recognize that collection would be premature prior to a determination of the level-up/level-down question.  Unlike here, in *Bennett*, there was no level-up/level-down inquiry to be made because the State had agreed that the statute required the same (higher) taxes of everyone. *See Bennett*, 284 U.S. at 241.  By contrast, where the level-up/level-down question has not yet been answered, the Supreme Court consistently remands for that determination to be made.  *See Fulton Corp. v. Faulkner*, 516 U.S. 325, 346-47 (1996); *Harper*, 509 U.S. at 100-102; *McKesson*, 496 U.S. at 51-52.  If collection attempts were a prerequisite to deciding to apply higher taxes to all, remands in those cases would not have been necessary.

88.     Third, the Eleventh Circuit misread *Reich v. Collins,* 513 U.S. 106 (1994), and *Newsweek, Inc. v. Florida Department of Revenue,* 522 U.S. 442 (1998), as holding that retrospective relief is required "except in the unusual context of a clear, exclusive predeprivation remedy." *Mosaic*, 71 F.4th at 1350.  Rather, the holdings in those cases turned on statutes that expressly provided a post-deprivation refund remedy.[13]  *See Reich*, 513 U.S. at 111-12 ("[N]o reasonable taxpayer would have thought that they represented, *in light of the apparent applicability*

---

[13] *See Reich*, 513 U.S. at 109 (Georgia statute provided: "A taxpayer shall be refunded any and all taxes or fees which are determined to have been erroneously or illegally assessed and collected from him under the laws of this state, whether paid voluntarily or involuntarily....");

*of the refund statute*, the exclusive remedy for unlawful taxes.") (emphasis added).  Rather than

holding that refunds are required unless a statute expressly says that only predeprivation relief is

available, what *Reich* and *Newsweek* held was that a state may not expressly say a postdeprivation remedy is available and then refuse to provide it.  *Reich*, 513 U.S. at 108.  *See also id*. at 111

("[W]hat a State may not do, and what Georgia did here, is to reconfigure its scheme, unfairly, in

midcourse—to 'bait and switch.'"); *Newsweek*, 522 U.S. at 444 (same).  No similar statute expressly providing a refund remedy exists here.

89.     In *USA Sales*, the Ninth Circuit largely followed the Eleventh Circuit's reasoning

in *Mosaic* to order monetary relief.  Defendants assert that the ruling suffers from the identical

defects of *Mosaic* and should not be given persuasive value for the same reasons.

90.     Plaintiff also cites *Siegel II* and *Pitta v. Andrew R. Vara (In re VG Liquidation)*,

No. 22-50416 (JTD), 2023 WL 3560414 (Bankr. D. Del. May 18, 2023), in support of his asser-

tion that monetary relief is appropriate.  Both decisions, however, rely largely on the grounds

later articulated by the Eleventh Circuit in *Mosaic*.  The same is true of *Ziehl v. Vara (In re TWC

Liquidation Trust, LLC)*, No. 18-10601 (MFW) (Bankr. D. Del. Sept. 14, 2023).  For the reasons

detailed above, Defendants respectfully submit that *Siegel II*, *VG Liquidation*, and *TWC* were

wrongly decided.

---

*Newsweek*, 522 U.S. at 443, 444 (Florida statute provided: "The Comptroller of the state may re-
fund ... any moneys paid into the State Treasury" and both the state and the Supreme Court had
interpreted the statute as providing a postpayment remedy).

**V.    EVEN IF THIS COURT WERE TO CONCLUDE REPAYMENT IS THE
APPROPRIATE REMEDY, THE UNITED STATES CANNOT LAWFULLY
REPAY UNTIL THE ATTORNEY GENERAL CERTIFIES THAT NO APPEAL
WILL BE TAKEN FROM THE JUDGMENT OR NO FURTHER REVIEW WILL
BE SOUGHT.**

91.    Under section 2414 of title 28, Congress authorized the payment of judgments

only after "the Attorney General determines that no appeal shall be taken from a judgment or that

no further review will be sought from a decision affirming the same," and the Attorney General

"so certif[ies]."  28 U.S.C. § 2414.  Only at that point is "the judgment . . . deemed final."  *Id*.

"Finality under 28 U.S.C. § 2414 protects the Government from prematurely paying a claim that

might later be reversed on appeal."  *Cedar Chem. Corp. v. United States*, 18 Cl. Ct. 25, 31-32

(1989).  *See also* Fed. R. Bankr. P. 7062; Fed. R. Civ. P. 62 (entitling the government to a stay

pending appeal without posting a bond).

92.    Section 2414 means that "[t]he United States cannot be required to pay [a] money

judgment against it until it has exhausted all appeals it decides to take."  *Dixon v. United States*,

900 F.3d 1257, 1268 (11th Cir. 2018).  The government's obligation to follow section 2414

transcends this case.

93.    Courts may not order the United States to make a payment before it is statutorily

authorized to do so.  28 U.S.C. § 2414.  Thus, the Eleventh Circuit reversed an order requiring

the government to pay a judgment within thirty days of a decision because it did not account for

the possibility that the government might seek further review.  *Dixon*, 900 F.3d at 1268; *see also*

*Cedar Chem.*, 18 Cl. Ct. at 31-32 ("Congress entrusts the determination of finality solely to the

Attorney General.  Title 28 of U.S.C. § 2414 grants this court no authority to perform a function

committed by law to (and exclusively to) the Attorney General."); *S. Yuba River Citizens League*

*v. Nat'l Marine Fisheries Serv.*, No. S-06-2845 LKK/JFM, 2012 WL 5387194, at *2, 4 (E.D.

Cal. Nov. 1, 2012) (refusing to require a date certain for payment because the federal defendant

does not control the disbursement of judgment appropriations); *TWC*, No. 18-10601 (MFW) (Bankr. D. Del. Sept. 14, 2023), slip op. at 15 (ruling that "the Court will enter judgment in favor of the Liquidating Trustee which requires payment only once its order becomes final and non-appealable").

94.    Should repayment ultimately prove to be the proper remedy, the United States will repay from the appropriate source of payment[14] after the Attorney General has certified that no appeal will be taken from the judgment or that no further review will be sought from a decision affirming the judgment.

**CONCLUSION**

For these reasons, the United States respectfully requests that the Court deny Plaintiff's summary judgment motion, grant the Defendants' summary judgment motion, and enter judgment in Defendants' favor.

---

[14] Plaintiffs seek a judgment requiring Defendants to direct the UST Fund to pay a monetary judgment. The UST Fund, however, is not financially responsible for final judgments or awards. *See* ¶ 80, *supra*.

Date: September 15, 2023                Respectfully submitted,

                                        By: /s/ *Timothy J. Fox, Jr.*

RAMONA D. ELLIOTT                          ANDREW R. VARA,
Deputy Director/General Counsel            United States Trustee, Region 3
P. MATTHEW SUTKO                           JOSEPH J. MCMAHON, JR.
Associate General Counsel                  Assistant United States Trustee
WENDY COX                                  TIMOTHY J. FOX, JR.
Trial Attorney                             Trial Attorney
Department of Justice                      KATE M. BRADLEY
Executive Office for                       Trial Attorney
United States Trustees                     Department of Justice
441 G Street, N.W., Suite 6150             Office of the United States Trustee
Washington, DC  20530                      844 King Street, Suite 2207
(202) 307-1399                             Lockbox 35
Fax: (202) 307-2397                        Wilmington, DE 19801
                                           (302) 573-6491
                                           Fax: (302) 573-6497
                                           Timothy.Fox@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2023, I electronically filed the foregoing with the Clerk of this Court using the CM/ECF system which will send notification of such filing to all ECF registrants in this case. I further certify that the foregoing was emailed to counsel for Plaintiff:

| | |
|---|---|
| Bradford J. Sandler<br>Pachulski Stang Ziehl & Jones LLP<br>780 Third Avenue<br>34th Floor<br>New York, NY 10017-2024<br>Email: bsandler@pszjlaw.com | Colin R. Robinson<br>Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801<br>Email: crobinson@pszjlaw.com |

/s/ *Timothy J. Fox*

Timothy J. Fox, Jr. (DE Bar No. 6737)